UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| STEVEN H. PARKER | § | |
| | § | Case No. 2:12-CV-00116 |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| FORBES ENERGY SERVICES LTD. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff Steven H. Parker ("Plaintiff" or "Parker"), and files this his

Original Complaint against Defendant Forbes Energy Services Ltd. ("Defendant" or "FES") and

for cause of action would show the Court as follows:

## I.
## INTRODUCTION

1.      This action seeks equitable relief, compensatory damages, punitive damages,

attorney's fees, expert witness fees, taxable costs of court, prejudgment and post-judgment

interest for Defendant's retaliation against Plaintiff for whistleblowing activities under the

Sarbanes-Oxley Act, 18 U.S.C. § 1541A, *et seq*.

2.      Plaintiff demands a jury on all issues triable to a jury.

3.      This action is brought under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, *et seq.,*

and specifically 18 U.S.C. § 1514A(b)(1)(B).

## II.
## PARTIES

4.      Plaintiff, Steven H. Parker is an individual currently residing in Corpus Christi,

Nueces County, Texas.

5.      Defendant Forbes Energy Services Ltd. is a Texas corporation duly authorized to

do business in the State of Texas. This Defendant may be served with the summons and this

complaint by serving its registered agent for service of process, Capitol Corporate Services, Inc. 800 Brazos, Suite 400, Austin, TX 78701.

6.      Whenever in this complaint it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

### III.
### JURISDICTION AND VENUE

7.      This court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 (federal question) since Plaintiff is bringing this claim under the Sarbanes-Oxley Act, specifically 18 U.S.C. § 1514A(b)(1)(B) which provides federal courts with jurisdiction over such claims without regard to amounts in controversy.

8.      The amount in controversy exceeds $75,000.00.

9.      The court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

10.     The Court has personal jurisdiction over Defendant since they maintain and operate businesses in the State of Texas and they have purposefully availed themselves of the protections of the State of Texas.

11.     Venue is proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391(b).

12.     The actions made the basis of this suit were committed within the jurisdiction of the United States District Court for the Southern District of Texas, Corpus Christi Division as Plaintiff's employment was at Defendant's office in Alice, Jim Wells County, Texas.

13.     This Court has jurisdiction over all claims in this action.

14.     The amount in controversy is within the jurisdictional limits of this Court.

**IV.**
**PROCEDURAL REQUISITES**

15.     All conditions precedent to filing this lawsuit have been met.

16.     Plaintiff filed a complaint, with the Occupational Safety and Health Administration ("OSHA") under the Sarbanes-Oxley Act of 2002 ("SOX") within 90 days after the alleged SOX violations occurred.

17.     Plaintiff filed this action more than 180 days after he filed his complaint with OSHA.

18.     Plaintiff filed this action before the Administrative Law Judge ("ALJ") issued a final decision on Plaintiff's OSHA complaint.

19.     The ALJ's failure to issue final decision within 180 days was not due to Plaintiff's bad faith.

**V.**
**FACTS**

**A.     SUMMARY**

20.     On or about August 16, 2011, Plaintiff was terminated from his employment with Defendant.

21.     Plaintiff was terminated in retaliation for engaging in activities that are protected under SOX.

22.     On or about May 4, 2011, Plaintiff was hired by Defendant as the Director of Financial Reporting.

23.     John Crisp is Defendant's Chief Executive Officer ("CEO").

24.     Charles C. Forbes, Jr. is Defendant's Chief Operating Officer ("COO").

25.     Melvin Cooper is Defendant's Chief Financial Officer ("CFO").

26.     Robin Williams was Defendant's Controller ("Controller").  Robin Williams is no longer employed by Defendant.

27.     Kelly Simmons was the employee Defendant hired to replace Plaintiff as Defendant's Director of Financial Reporting after Plaintiff's termination.  Kelly Simmons is no longer employed by Defendant.

28.     BDO is Defendant's accounting firm.

29.     Joseph Hatfield is a CPA employed by BDO.

30.     Karen Macdonald is a CPA employed by BDO.

31.     During Plaintiff's employment, Plaintiff was asked to terminate one of Defendant's existing equipment leases and discovered illegal transactions by Defendant, its CEO, and its COO.

32.     Defendant's CEO and COO owned a separate private company, Alice Environmental, which leased equipment to the Defendant.

33.     Defendant's CEO and COO terminated the leases early using transactions not within lease agreement terms, used inflated appraisals to justify early termination, failed to provide the Defendant's Board of Directors complete details about the early lease termination, did not represent best interests of Defendant's shareholders, and personally profited from the early lease(s) terminations.

34.    Defendant's CEO and COO personally received a $1.3 Million profit from the early termination of the lease.

35.    Plaintiff notified Defendant's CFO the transactions violated arm's length and proper accounting treatments.

36.    Plaintiff notified BDO the transactions violated arm's length and proper accounting treatments.

37.    In May, June, and July 2011, Plaintiff sent emails to Defendant's CFO reporting, questioning, and inquiring about the improper accounting practices Defendant used for the lease transaction and early lease termination.

38.    In May, June, and July 2011, Plaintiff verbally reported SOX violations to Defendant's CFO concerning the lease transaction and early lease termination.

39.    In May, June, and July 2011, Plaintiff sent emails to Defendant's Controller reporting, questioning, and inquiring about the improper accounting practices Defendant used for the lease transaction and early lease termination.

40.    In May, June, and July 2011, Plaintiff verbally reported SOX violations to Defendant's CFO concerning the lease transaction and early lease termination.

41.    In May, June, and July 2011, Plaintiff sent emails to BDO reporting, questioning, and inquiring about the improper accounting practices Defendant used for the lease transaction and early lease termination.

42.    In May, June, and July 2011, Defendant had personal knowledge of Plaintiff's complaints about SOX noncompliance, probable SOX violation, missing internal accounting controls, and improper accounting standards.

43.     Plaintiff notified Defendant's CFO the lease agreement(s) did not include contractual language authorizing the lease terminations, or the use of appraisals to terminate the lease.

44.     Plaintiff notified Defendant's CFO the records did not accurately and fairly reflecting the lease transactions and dispositions of Defendant's assets.

45.     Plaintiff notified Defendant's CFO, Defendant's Controller, and Defendant's accounting firm (BDO), to alert them the lease accounting treatment(s) were not proper, and were used to hide debt covenant violations.

46.     Plaintiff continually notified Defendant about internal control violations relative to Generally Accepted Accounting Practices ("GAAP").

47.     Plaintiff continually notified Defendant about debt covenant anomalies regarding leased oil & gas well equipment, which affected Defendant's 10-Q public filing.

48.     Plaintiff continually notified Defendant about the CEO and COO obtaining an ill-gotten financial gain in excess of $1 Million from Defendant's purchase of equipment from a company owned by Defendant's CEO and COO.

49.     Plaintiff continually notified Defendant the transaction was not in the best interest of Defendant's shareholders.

50.     Plaintiff continually notified BDO about Defendant's CEO and COO obtaining an ill-gotten financial gain in excess of $1 Million from Defendant's purchase of equipment from a company owned by Defendant's CEO and COO.

51.     Defendant's actions indicate there was an intentional refusal to provide adequate internal controls at Defendant's office.

52.     In response to Plaintiff's complaints, Defendant retaliated against Plaintiff.

53.     On Monday, August 15, 2011, Defendant filed the Form 10-Q Report with the SEC.

54.     The next day, August 16, 2011, Defendant's CFO terminated Plaintiff's employment in response to Plaintiff's complaints about SOX violations.

**B.     COMPANY INFORMATION**

55.     Defendant, together with its subsidiaries, operates as an independent oilfield services contractor providing various well site services to oil and natural gas drilling and producing companies for the production of oil and natural gas in the U.S. and Mexico.

56.     Defendant operates through two segments, (1) Well Servicing, and (2) Fluid Logistics and Other.

57.     The Well Servicing segment offers well maintenance services, including remedial repairs, and removal and replacement of downhole production equipment; well workovers services comprising significant downhole repairs, re-completions, and re-perforations; completion and swabbing activities; and plugging and abandoning services.

58.     As of March 31, 2011, Defendant utilized a fleet of 173 owned or leased well servicing rigs, which include 162 workover rigs and 11 swabbing rigs, and related assets and equipment. This segment also has a fleet of nine tubing testing units used to conduct pressure testing of oil and natural gas production tubing.

59.     The Fluid Logistics and Other segment utilizes a fleet of owned or leased fluid transport trucks and related assets, such as specialized vacuum, high-pressure pump and tank trucks, frac tanks, water wells, salt water disposal wells and facilities, and related equipment. This segment also provides, transports, stores, and disposes various drilling and produced fluids used in and generated by oil and natural gas production.

60.     Defendant's company was founded in 2003, and is headquartered in Alice, Texas.

61.     Defendant is a publicly traded company on the U.S. Stock Exchange with a class of Securities registered under Section 12(b) of the Securities Exchange Act of 1934, and required to file quarterly reports pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934.

## C.     BACKGROUND

62.     John Crisp and Charles C. Forbes, Jr. are also owner-managers of Alice Environmental Holding, LTD ("AEH").

63.     AEH is the sole owner of Alice Environmental Services LP ("AES").

64.     In June 2011, John Crisp and Charles C. Forbes, Jr. obtained an ill-gotten gain in excess of $1 Million on the sale of equipment from AES to Defendant.

65.     John Crisp and Charles C. Forbes, Jr. did not act in the best interest of Defendant's shareholders by interpreting a lease contract in favor of AES and pushing up appraisal prices, including using a non-certified appraiser with which they conducted other deals.

66.     Defendant's shareholders were deprived of the financial gain and benefit on the sale of equipment from AES to Defendant.

67.     In late spring early summer of 2008, Charles C. Forbes, Jr. began purchasing equipment for CC Forbes, LLC ("CCF"), Group Company of Defendant.

68.     In late summer and early fall, 2008, Defendant's CFO Melvin Cooper became aware of the purchases and the fact the purchases would violate certain debt covenants with Defendant's lenders.

69.     Melvin Cooper advised John Crisp and Charles C. Forbes, Jr. to create an off balance sheet transaction to finance the leases to avoid a covenant violation and avoid having to notify the lenders.

70.     During his employment with Defendant, Plaintiff was advised of this occurrence by Defendant's CFO Melvin Cooper, and Defendant's Controller Robin Williams.

71.     In October 2008, John Crisp, Charles C. Forbes, Jr. and Melvin Cooper, executive officers of Defendant created a lease transaction so that AES would pay for the equipment that had been substantially purchased between July 2008 and October 2008 by CCF.

72.     The transaction was characterized and represented as an operating lease in the SEC filings of Defendant. In so doing, the equipment and debt was not shown in the balance sheet and avoided impacting debt covenants.

73.     The primary equipment in the transaction, ten workover oil and gas rigs were purchased by CCF and invoiced to CCF and the ownership was transferred directly to the Defendant Group of companies before the execution of the lease.

74.     In addition, the rigs were fitted to CCF specifications. Six of the rigs were exported by the Defendant Group in their titled name as owner to a Defendant Group company in Mexico.

75.     According to Accounting Standards Codification 840, the lease should have been characterized as a capital lease because it failed one of four criteria tests in that the lease transferred ownership at the start of the lease and therefore before the end of the lease. Accordingly, the equipment and lease debt should have been included in the balance sheet.

76.     The documents supporting the transfer of ownership were examined by the Plaintiff while an employee of Defendant.

77.     In June 2011, John Crisp and Charles C. Forbes, Jr. terminated the lease by selling the equipment from AES to Defendant. The lease did not include language providing for the early termination of the lease. John Crisp and Charles C. Forbes, Jr. with the support of Melvin

Cooper acted in the interest of AES, the private company controlled by John Crisp and Charles C. Forbes, Jr. by interpreting the lease in the favor of AES and using appraised values rather than historical cost book values to base the lease buy out prices.

78.     Further, John Crisp and Melvin Cooper pushed up the appraised values by successively requesting additional appraisals from three different companies, with each appraisal higher than the previous. The third appraisal was obtained by John Crisp from an auction house that was not a certified appraiser. John Crisp had a previous business relationship with the auction house independent of the appraisals.

79.     The best interest of the Defendant shareholders were not represented in the interpretation of the lease and the appraised values, resulting a personal gain over the book value of the equipment in excess of $1 Million to John Crisp and Charles C. Forbes, Jr. individually, while the shareholders were deprived of the gain in the form of higher book value and higher depreciation expense in the future.

80.     In May, June, and July 2011 during his employment with Defendant, Plaintiff repeatedly notified and reported the above-mentioned SOX violations concerning the lease transaction to Defendant, its CFO, and its Controller.

81.     Plaintiff also sent several emails to Defendant's Controller, CFO, BDO, Hilco Appraisal, Hadco Appraisal, and Kruse Energy (auctioneers acting as appraiser) reporting, questioning, and inquiring about the improper accounting practices Defendant used for the lease transaction and early lease termination.

82.     The relevant documents, evidence, reports, and records documenting Plaintiff's findings about the SOX violations are contained in a three-ring notebook left in the possession of Defendant's CFO, Melvin Cooper.

83.     The documents in the three-ring notebook are also electronically stored in digital files on Defendant's computer server.

**D.     EMPLOYMENT**

84.     Plaintiff's first day at work for Defendant was May 4, 2011.

85.     Plaintiff was an employee of Defendant.

86.     Plaintiff engaged in protected conduct and activities covered by SOX.

87.     Specifically, Plaintiff provided information that he reasonably believed to be a violation of various accounting regulations and securities laws to the types of persons listed in SOX. See 18 U.S.C. §§ 1514A.

88.     Plaintiff's notification and complaints of SOX violations, the lack of internal accounting controls, and Defendant's intentional refusal to implement those controls fit squarely with the aims and goals of SOX.

89.     Although Plaintiff was not obligated to demonstrate the validity of any of his allegations, he clearly demonstrated he acted with reasonable beliefs these acts were based on perceived violations of internal financial controls, applicable laws or regulations.

90.     Defendant retaliated against Plaintiff because of his protected conduct.

91.     Defendant attempted to mask the retaliation by classifying Plaintiff's termination as alleged job performance issues.

92.     Plaintiff was not terminated for job performance issues.

93.     SOX explicitly prevents employers from terminating employees who report their concerns to "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct." 18 U.S.C. § 1514A(a)(1)(C).

94.     Defendant's CFO hired Plaintiff as the Director of Financial Reporting to analyze, draft, revise, and monitor the Defendant's financial reports.

95.     While performing his job, Plaintiff continuously reported and raised concerns to Defendant's CFO regarding SOX compliance, accounting practices, improper related party transactions, and self dealing by Defendant's officers.

96.     While performing his job, Plaintiff correctly expected corrective actions to occur in response to his complaints.

97.     Instead of taking any corrective actions, Defendant and its CFO punished and retaliated against Plaintiff on several occasions and finally terminated him from his position on August 16, 2011 in violation of 18 U.S.C. § 1514A (a)(1)(C).

98.     After Plaintiff's termination, Defendant hired Kelly Simmons to be the Director of Financial Reporting.

99.     In late 2011, Kelly Simmons also complained to Defendant, its CFO, and its officers about possible SOX violations, missing internal accounting controls, and improper accounting standards.

100.     Shortly thereafter, Kelly Simmons was no longer employed by Defendant.

## E.     DEFENDANT'S FILINGS WITH THE SEC

101.     Defendant is a Texas Corporation required to file Form 10-Q quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the quarterly period ended June 30, 2011.

102.     The Defendant's Form 10-Q quarterly report for period ended June 30, 2011 included the following disclosure:

*The unaudited condensed consolidated financial statements of the Forbes Group are prepared in conformity with accounting principles generally accepted in the United States of America, or "GAAP" for interim financial reporting.*

103.    The Financial Accounting Standards Board issues an Accounting Standards Codification to define United States of America "GAAP."

## F.    FES EXECUTIVES ILL-GOTTEN FINAINCIAL GAIN FROM A RELATED PARTY TRANSACTION

104.    Defendant's Form 10K as of December 31, 2008 disclosed the following transaction:

*In October 2008, the Forbes Group entered into a five year, operating lease agreement with AES to lease ten workover rigs and related support equipment. The gross lease amount of this agreement is approximately $15.2 Million with monthly payments of approximately $0.3 Million. The Forbes Group has the option to purchase the equipment at the end of the term for a purchase price of approximately $5.3 Million.*

105.    The calculated interest rate on the above lease transaction is approximately 10.0% as per the amortization schedule prepared by the Plaintiff as an employee of Defendant.

106.    Defendant's Form 10Q as of June 30, 2011 disclosed the following transaction:

*In October 2008, the Forbes Group entered into a five year lease agreement with AES to lease ten workover rigs and related support equipment. The gross lease amount of this agreement was approximately $15.2 Million with monthly payments of approximately $0.3 Million. On June 27, 2011, the Forbes Group purchased the rigs and support equipment and terminated the lease early. On June 27, 2011, the Company purchased from AES the equipment being leased pursuant to the two equipment leases described above, as wells as certain other frac tank equipment being rented from AES. The Company paid AES an aggregate purchase price of approximately $11.7 Million plus $1.5 Million to cover estimated sales tax.*

107.    The calculated lease amount due on June 15th per the amortization schedule is $10,445,278.00.  According to the disclosure, Forbes Group ("Forbes") paid $11.7 Million plus $1.5 Million sales tax and terminated the lease.

108.    The language in the above disclosure does not correctly reflect the underlying transaction in that the $11.7 Million was the amount paid for the ten workover rigs and related support equipment on the five year lease agreement in October 2008 with AES.

109.    The estimated sales tax was an additional amount of approximately $1.0 Million.

110.    The frac tank equipment purchase with AES was not disclosed, but was approximately $4.0 Million without sales tax. The second equipment lease is mentioned in another disclosure at an aggregate purchase price of approximately $2.1 Million plus $0.2 Million to cover estimated sales tax.

111.    The gross amount paid to AES from Forbes was approximately $19.5 Million before a sales tax refund due from AES back to Forbes for approximately $0.5 Million.

112.    Forbes Group paid AES on the October 2008 lease $11.7 Million plus $0.5 Million or approximately $1.3 Million over the amount due on the amortization schedule of $10.4 Million.

113.    Defendant's Form 10Q as of June 30, 2011 disclosed the following under note 9, related party transactions:

> *The Forbes Group enters into transactions with related parties in the normal course of conducting business. Accounts receivable–related parties and Accounts payable–related parties result from transactions with related parties which the company believes are at terms consistent with those available to third-party customers and from third-party vendors. Messrs. John E. Crisp and Charles C. Forbes Jr., executive officers and directors of Defendant Ltd, are also owners and managers of Alice Environmental Holdings, Ltd and indirect owners and managers of Alice Environmental Services, LP a wholly owned subsidiary of Alice Environmental Holdings, Ltd, collectively referred to as AES.*

114.    Charles C. Forbes, Jr. and Melvin L. Cooper constructed the lease agreement with a 10% calculated interest rate. The lease agreement did not provide any provision or language for early buyout of the lease.

115.    John E. Crisp determined the final purchase price paid to terminate the lease.

116.    John E. Crisp hired an uncertified appraiser to provide a third appraisal to increase the final appraisal price determined to support his interpretation of the lease and his view of the value.

117.    The first two appraisals were obtained by Melvin Cooper, the CFO from certified appraisers. The second appraisal was obtained after the first appraisal came in low. Most importantly, the lease did not contain any language for early termination or requirement to appraise the assets.

118.    The Defendant's non literal interpretation of the lease agreement favored the personal assets of Crisp and Forbes, resulted in an excess profit to AES, and deprived the Defendant's investors of the profit.

119.    AES, a related party controlled by the executives of Forbes, earned in excess of $1 Million in a gain over the lease amortization schedule amount due.

120.    The lease agreement contained no language providing for the early termination of the lease and no defined based for the buyout amount.

121.    The executives of Defendant acted in favor of AES and against Defendant shareholders in the interpretation of the lease and in the valuation of the lease termination.

122.    Further the lease transactions were not fully detailed or disclosed in the SEC filings so that a shareholder would have full knowledge of the ill-gotten personal financial gains received by Defendant's officers.

## G.   DEFENDANT'S MISCHARACTERIZATION OF THE CAPITAL LEASE AS AN OPERATING LEASE

123.    Accounting Standard Codification ("ASC") 840-10-25-29 is the generally accepted accounting principle for the lessee application of lease classification criteria for a capital lease:

ASC § 840-10-25-29. If at its inception a lease meets any of the four lease classification criteria in paragraph 840-10-25-1, the lease shall be classified by the lessee as a capital lease.

124.    Accounting Standard Codification 840-10-25-30 is the generally accepted accounting principle for the lessee application of lease classification criteria for an operating lease:

ASC § 840-10-25-30. If none of the four criteria in paragraph 840-10-25-1 are met, the lease shall be classified by the lessee as an operating lease.

125.    Accounting Standard Codification 840-10-20 contains the glossary definition for a capital lease:

Capital lease: From the perspective of a lessee, a lease that meets any of the four lease classifications criteria in paragraph 840-10-25-1.

126.    Accounting Standard Codification 840-10-25-1 contains the Lease Classification Criteria. A lessee and a lessor shall consider whether a lease meets any of the following four criteria as part of classifying the lease at its inception under the guidance in the Lessees Subsection of this Section (for the lessee) and the Lessors Subsection of this Section (for the lessor):

(a) Transfer of ownership. The lease transfers ownership of the property to the lessee by the end of the lease term. This criterion is met in situations in which the lease agreement provides for the transfer of title at or shortly after the end of the lease term in exchange for the payment of a nominal fee, for example, the minimum required by statutory regulations to transfer title.

(b) Bargain purchase option. The lease contains a bargain purchase option.

(c) Lease term. The lease term is equal to 75 percent or more of the estimated economic life of the lease property. However, if the beginning of the lease term falls within the last 25 percent of the total estimated economic life of the leased property, including earlier years of use, this criterion shall not be used for purposes of classifying the lease.

(d) Minimum lease payments. The present value at the beginning of the lease term of the minimum lease payments, excluding that portion of the payments representing executor costs such as insurance, maintenance, and taxes to be paid by the lessor, including any profit thereon, equals or exceeds 90 percent of the excess of the fair value of the leased property to the lessor at lease inception over any related investment tax credit retained by the lessor and expected by the lessor. If the beginning of the lease term falls within the last 25 percent of the total estimated economic life of the leased property, including earlier years of use, this criterion shall not be sued for purposes of classifying the lease.

127.     In evaluating the four criteria, the lease legal form did not meet criteria (b)-(d).

128.     The lease did not include a bargain purchase option, the lease term of 5 years did not exceed the economic life of 20 years of the rigs and the minimum lease payments present value did not exceed 90% of the fair value of the rigs at inception of the lease.

129.     However, in evaluating criteria (a), the transfer of ownership occurred "before" the end of the lease.

130.     The invoices from the manufacturer were issued in a Defendant Group company CCF and Defendant Group management exported six of the rigs to Mexico in the name of and to a Defendant Group company.

131.     Based on the substance of the transactions, criteria (a) was met and therefore the lease should have been classified as a capital lease.

132.     Accounting Standard Codification 840-10-25-26 is the generally accepted accounting principle for the classification of a Lease between Related Parties:

ASC § 840-10-25-26. Except as noted in the following sentence, leases between related parties (see paragraph 840-10-55-27) shall be classified in accordance with the lease classification criteria in paragraphs 840-10-25-1, 840-10-25-31, and

840-10-25-41 through 25-44. Insofar as the separate financial statements of the related parties are concerned, the classification and accounting shall be the same as for similar leases between unrelated parties, except in circumstances in which it is clear that the terms of the transaction have been significantly affected by the fact that the lessee and lessor are related. In such circumstances the classification and accounting shall be modified as necessary to recognize economic substance rather than legal form.

133. The economic substance of the transaction was for Defendant to purchase 10 workover rigs and equipment.

134. Defendant's cash and equivalents as of December 31, 2008 was $23.5 Million, more than the amount of the rigs and supporting equipment purchase.

135. An additional economic substance of the transaction was for Defendant to finance the equipment. The legal form of the transaction was created so that Forbes would not violate debt covenants in the debt financing of the workover rigs by using an off balance sheet transaction.

136. Defendant's SEC filings did not provide its investors with adequate disclosure in the event of debt violation of covenants or the requirement for Defendant to obtain debt covenant waivers from lenders.

137. In addition, investors were not provided balance sheet classification of an off balance sheet debt or disclosure of interest rates.

138. As in ASC § 840-10-25-26, economic substance should modify the legal form of an agreement, when the agreement is between related parties.

139. The economic substance of the transaction between AES and Defendant was AES to provide capital funding to Defendant. The lease was created subsequent to the purchase of equipment and to avoid violating debt covenants.

140.    The independent auditors and CPA's at BDO did not place any emphasis in accounting for the leases considering the close relationship between AES and Defendant.

## VI.
## SARBANES-OXLEY WHISTLEBLOWER RETALIATION

141.    Plaintiff reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

142.    Defendant is a publicly traded company on the U.S. Stock Exchange with a class of Securities registered under Section 12(b) of the Securities Exchange Act of 1934, and required to file quarterly reports pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934.

143.    Plaintiff was an employee of Defendant or of one of its officers, employees, contractors, subcontractors, or agents, or was a person whose employment could be affected by Defendant or one of its officers, employees, contractors, subcontractors, or agents.

144.    Plaintiff provided information to persons with supervisory authority over him and persons employed by Defendant who had the authority to investigate, discover, or terminate misconduct.

145.    Plaintiff reasonably believed that the information he provided to such persons involved conduct that would constitute a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal Law relating to fraud against shareholders.

146.    Specifically, and without limitation, Plaintiff reasonably believed Defendant violated the following statutes:

    (a)  18 U.S.C. § 1341 (mail fraud);

    (b)  18 U.S.C. § 1343 (wire fraud);

    (c)  18 U.S.C. § 1348 (securities fraud);

(d) any rule or regulation of the SEC; and

(e) any provision of federal law relating to fraud against shareholders.

147.    Additionally, and without limitation, Plaintiff reasonably believed Defendant violated Section 13 of the Securities Exchange Act of 1934 requiring companies to:

(a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. 15 U.S.C. § 78m(b)(2)(A).

(b) devise and maintain a system of internal accounting controls. 15 U.S.C. § 78m(b)(2)(B).

(c) No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls. 15 U.S.C. § 78m(b)(3)(B)(5).

148.    Defendant, itself or through its officers, employees, contractors, subcontractors, or agents discriminated against Plaintiff in the terms and conditions of his employment by terminating his employment in retaliation against him for raising complaints or otherwise engaging in protected conduct under SOX.

149.    Accordingly, this lawsuit is authorized under SOX, 18 U.S.C § 1514A(b)(1)(B).

## VII.
## ATTORNEY'S FEES

150.    Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

151.    Pursuant to SOX, specifically 18 U.S.C § 1514A(c)(2)(C), Plaintiff is entitled to recover reasonable attorney fees, litigation costs, and expert witness fees for bringing this action.

## VIII.
## JURY DEMAND

152.    Pursuant to SOX, specifically 18 U.S.C § 1514A(b)(2)(E), Plaintiff demands a jury trial on all issues triable to a jury.

## IX.
## RELIEF REQUESTED

153.    Accordingly, Plaintiff respectfully requests that the Court:

(a)    Grant judgment in Plaintiff's favor with regard to his claims pleaded under Sarbanes-Oxley, including all compensatory damages and other equitable relief to which he may show himself entitled under those statutes;

(b)    Enter an award of reasonable attorney's fees, litigation costs, and expert witness fees in favor of Plaintiff pursuant to 18 U.S.C. § 1541A(c);

(c)    For actual and liquidated damages for the period of time provided by law, including appropriate back pay and reimbursement for lost wages, pension, insurance, and all other benefits;

(d)    Reinstatement, or in lieu of reinstatement, front pay and reimbursement for future lost wages, pension, insurance, and all other benefits that will be lost in future;

(e)    For compensatory damages and punitive damages as allowed by law;

(f)    Enter an award of attorneys' fees in favor of Plaintiff;

(g)    For pre-judgment and post-judgment interest as allowed by law;

(h)    For Plaintiff's costs of court and other appropriate expenses and costs of prosecuting Plaintiff's claim; and

(i)    For such other and further relief to which Plaintiff may be justly entitled, as this Court deems appropriate.

Respectfully Submitted,

**HUGHES ELLZEY, LLP**


_____/s/  W. Craft Hughes_____
W. Craft Hughes
Attorney-in-Charge
State Bar No. 24046123
Federal I.D. No. 566470
E-Mail: craft@crafthugheslaw.com
Jarrett L. Ellzey
State Bar No. 24040864
Federal I.D. No. 37369
E-Mail: jarrett@crafthugheslaw.com
2700 Post Oak Blvd., Ste. 1120
Galleria Tower I
Houston, TX 77056
Phone: (713) 554-2377
Fax: (888) 995-3335

ATTORNEYS FOR PLAINTIFF
STEVEN H. PARKER

## NOTICE OF ELECTRONIC FILING

I, do hereby certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing document in accordance with the Electronic Case Filing System of the U.S. District Court for the Southern District of Texas, on this the 20th day of April, 2012.

*/s/  W. Craft Hughes*
W. Craft Hughes

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(b) of the FEDERAL RULES OF CIVIL PROCEDURE and 29 C.F.R. § 1980.114(b), I certify that a true and correct copy of the file-stamped complaint will be served on the following parties within seven days after the complaint is filed in Federal Court.

***Via Certified Mail, RRR***
***#7011-2000-0001-1177-5322***
U.S. Department of Labor
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street NW, Ste. 400 North
Washington, D.C. 20001-8002

***Via Certified Mail, RRR***
***#7011-2000-0001-1177-5346***
U.S. Department of Labor
Associate Solicitor
Fair Labor Standards Division
200 Constitution Ave. NW, Rm. N2716
Washington, D.C. 20210

***Via Certified Mail, RRR***
***#7011-2000-0001-1177-5339***
U.S. Department of Labor-OSHA
Regional Administrator
525 Griffin Street, Room 602
Dallas, TX 75202

***Via Certified Mail, RRR***
***#7011-2000-0001-1177-5353***
U.S. Department of Labor
Office of the Assistant Secretary-OSHA
200 Constitution Avenue, Rm. S2315
Washington, D.C. 20210

*/s/  W. Craft Hughes*
W. Craft Hughes
